UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| CHARLES ASBERGER, | Case No. 2:14-cv-01209-RFB-PAL |
| Plaintiff, | **REPORT OF FINDINGS AND RECOMMENDATION** |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | (Mot. To Remand – ECF No. 17) (Cross-Mot. to Affirm – ECF No. 22) |
| Defendant. | |

This matter involves Plaintiff Charles Asberger's ("Asberger") appeal and request for judicial review of the Acting Commissioner of Social Security, Defendant Carolyn W. Colvin's final decision denying his claim for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–33, and claim for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

## BACKGROUND

### I.    PROCEDURAL HISTORY

Asberger protectively filed a Title II application for a period of disability on October 7, 2010, and also protectively filed a Title XVI for supplemental security income on October 8, 2010. AR 133-139, 140-147.  His work history reports indicate he worked as a casino dice dealer from January 1991 through December 2006, and in phone sales telemarketing from "the summer of 2007 through January 15, 2007."  AR 182-188.  A second work history report expanded on his work history and reported he began working in casinos in June 1995, and had also worked in a gas station and in car sales through 2006.  AR 222-229.  His applications for disability insurance benefits and supplemental security income benefits indicated he became disabled beginning January 15, 2007.  AR 133-139, 140-147.  His adult disability report stated he was unable to work

1

due to bulging discs in the lower back, because he could not stand up straight, had shoulder and neck problems, and suffered from depression and chronic pain.  AR 160-171.

The Social Security Administration denied Plaintiff's applications initially on July 17, 2011, and July 12, 2011, AR 66, and on reconsideration on September 14, 2011, AR 67-68.  The Administrative Law Judge ("ALJ") held a hearing on November 13, 2012, where Asberger appeared with attorney Robert Fleming.  AR 41-56.

During the hearing, Asberger's counsel asserted that the theory of his case was that Asberger's continued complaints of chronic neck, shoulder, and back pain, as well as his noted limitations in reaching, his need to use a walker for long distances, and inability to stand and/or walk for 6 hours in an 8-hour day made him unable to perform his past relevant work as a casino dealer, or a full range of light work for a sustained period of time.  AR 42.  In addition, counsel argued that his past work as a car salesman and telemarketer did not provide sufficient earnings which would qualify as substantial gainful activity, and therefore requested that they not be counted as his past relevant work.  *Id.*  Counsel asserted that based on Asberger's age and inability to perform light work, he would "grid out as disabled under Medical Vocational Rule 201.10."  *Id.*  Counsel also indicated that he was waiting on requested medical records from UMC Lied Clinic from 2011, to the present.  AR 41.  The ALJ held the administrative record open for thirty days to allow Asberger to update his medical records as requested.  AR 42.  The ALJ later received and considered the supplemental records from UMC Lied.  AR 13.

In a decision dated February 6, 2013, ALJ found that Asberger was not disabled.  AR 13-33.  Asberger requested review of the ALJ's decision by the Appeals Council, but the ALJ's decision became final when the Appeals Council denied review on April 17, 2014.  AR 3-7.  Asberger filed a Complaint (ECF No. 1) in federal court, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her Answer (ECF No. 13).  Asberger filed a Motion to Remand (ECF No. 17), and the Commissioner filed a Response and Cross-Motion for Summary Judgment (ECF Nos. 22, 23).  The court has considered the Motion, the Response and Cross-Motion, and Plaintiff's Reply (ECF No. 24).

1

# DISCUSSION

2  **I.    APPLICABLE LAW**

3      **A.    Judicial Review of Disability Determination**

4        District courts review administrative decisions in social security benefits cases under 42

5  U.S.C. § 405(g). *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002). The statute provides

6  that after the Commissioner has held a hearing and rendered a final decision, a disability claimant

7  may seek review of that decision by filing a civil lawsuit in a federal district court in the judicial

8  district where the disability claimant lives. 42 U.S.C. § 405(g). The statute also provides that the

9  district court may enter, "upon the pleadings and transcripts of the record, a judgment affirming,

10  modifying, or reversing the decision of the Commissioner of Social Security, with or without

11  remanding the cause for a rehearing." *Id.*

12        The Commissioner's findings of fact are conclusive if supported by substantial evidence.

13  42 U.S.C. § 405(g); *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005). But the Commissioner's

14  findings may be set aside if they are based on legal error or not supported by substantial evidence.

15  *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *Thomas v. Barnhart*, 278

16  F.3d 947, 954 (9th Cir. 2002). The Ninth Circuit defines substantial evidence as "more than a

17  mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

18  might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

19  Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). In determining

20  whether the Commissioner's findings are supported by substantial evidence, a court "must

21  consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum

22  of supporting evidence'." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (quoting *Hill v.*

23  *Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

24        Under the substantial evidence test, a court must uphold the Commissioner's findings if

25  they are supported by inferences reasonably drawn from the record. *Batson v. Comm'r Soc. Sec.*

26  *Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2003). When the evidence will support more than one

27  rational interpretation, a court must defer to the Commissioner's interpretation. *Burch v. Barnhart*,

28  400 F.3d 676, 679 (9th Cir. 2005). Consequently, the issue before a court is not whether the

Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent upon an ALJ to make specific findings so that a court does not speculate as to the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014). Mere cursory findings of fact without explicit statements about what portions of the evidence were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981). An ALJ's findings should be comprehensive, analytical, and include a statement explaining the "factual foundations on which the ultimate factual conclusions are based." *Id. See also Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (an ALJ need not discuss all the evidence in the record, but must explain why significant probative evidence has been rejected).

## B.    Disability Evaluation Process

A claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant must provide specific medical evidence to support his or her claim of disability. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *See Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (noting that a claimant bears the burden of proof until the final step in the evaluation process).

## II.    THE ALJ'S DECISION

An ALJ follows a five-step sequential evaluation process in determining whether a claimant is disabled. 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). If at any step an ALJ makes a finding of disability or non-disability, no further evaluation is required. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

Here, the ALJ followed the five-step sequential evaluation process and issued an unfavorable decision on February 6, 2013 (the "Decision").  AR 13-33.

Asberger does not challenge the ALJ's findings at steps one through three, but asserts legal error at steps four and five.

In addition, the parties stipulate that the ALJ fairly and accurately summarized the evidence and testimony of record in the Decision, except as specifically addressed in their arguments.

### A.    Step One

The first step of the disability evaluation requires an ALJ to determine whether the claimant is currently engaging in substantial gainful activity ("SGA").    20 C.F.R. §§ 404.1520(b), 416.920(b).  SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit.  20 C.F.R. §§ 404.1572(a)–(b), 416.972(a)–(b).  If the claimant is currently engaging in SGA, then a finding of not disabled is made.  If the claimant is not engaging in SGA, then the analysis proceeds to the second step.

At step one in the Decision, the ALJ found that Asberger had not engaged in SGA since January 15, 2007, the alleged onset date.  AR 17.  Given Asberger's lack of SGA, the ALJ's analysis proceeded to the second step.

### B.    Step Two

The second step of the disability evaluation addresses whether a claimant has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work.  20 C.F.R. §§ 404.1521, 416.921; Social Security Rulings ("SSRs") 85-28 (Jan. 1, 1985), 96-3p, 61 Fed. Reg. 34468 (July 2, 1996); 96-4p, 61 Fed. Reg. 34488 (July 2, 1996).[1]  If a claimant does not have a severe medically-

---

[1] SSRs are the SSA's official interpretations of the Act and its regulations.  *See Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).  They are entitled to some deference as long as they are consistent with the Act and regulations.  *See Bray*, 554 F. 3d at 1223 (finding ALJ erred in disregarding SSR 85-41).

determinable impairment or combination of impairments, then an ALJ will make a finding that a claimant is not disabled. If a claimant has a severe medically-determinable impairment or combination of impairments, then an ALJ's analysis proceeds to the third step.

### 1. Asberger's Severe Impairment(s)

At step two in the Decision, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease, and arthritis of the cervical, thoracic, and lumbar spine.

### 2. Asberger's Non-Severe Impairments

In making his findings at step two in the Decision, the ALJ specifically considered all of Plaintiff's medically determinable impairments, including a number of non-severe impairments. AR 17. The ALJ found that other impairments, including Asberger's reported hypertension, remote history of left shoulder surgery, and history of bradycardia, were non-severe because the record did not document any significant limitations associated with these impairments, and his aggregate conditions appeared to be adequately controlled by medications when he remained compliant. *Id.* He therefore found that these non-severe impairments did not cause significant limitations in Asberger's ability to perform basic work activities. *Id.* Asberger also complained of back, neck and bilateral shoulder pain at the hearing. *Id.* The ALJ noted that pain, per se, is not a medically determinable impairment, and could simply be a symptom associated with intermittent strain. *Id.* However, he considered any alleged symptoms in determining Asberger's RFC. *Id.*

Asberger also complained of depressive disorder and anxiety order which the ALJ found did not cause more than minimal limitation in Asberger's ability to perform basic mental work activities and was, therefore, non-severe. AR 18.

### C. Step Three

Step three of the disability evaluation requires an ALJ to determine whether a claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is commonly referred to as the "Listings." 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.826. If a claimant's impairment or combination of impairments meet or equal the criteria of the Listings

and meet the duration requirement (20 C.F.R. §§ 404.1509, 416.909), then an ALJ makes a finding of disability.  20 C.F.R. §§ 404.1520(h), 416.920(h).  If a claimant's impairment or combination of impairments does not meet or equal the criteria of the Listings or meet the duration requirement, then the analysis proceeds to the next step.

At step three in the Decision, the ALJ found that Asberger did not have an impairment or combination of impairments that meets or medically equals the criteria of one of the listed impairments.  In making his finding, he considered Asberger's impairments singularly and in combination along with his alleged symptoms and limitations.  AR 18-19.  He assessed Asberger's allegation of chronic back pain and generalized body pain by the criteria in Section 1.00 Musculoskeletal System, Appendix 1.  However, the medical evidence of record did not meet the level of severity required by any listing in this section, and no medical source had stated that Asberger's condition was severe enough to meet any listed impairment.  AR 19.  He also noted that Asberger had not received anything more than routine conservative treatment for orthopaedic/joint dysfunction with regard to listing 1.02 despite a remote history of left shoulder surgery.  The ALJ was not provided with notes regarding this left shoulder surgery to review.  *Id.* Additionally, medical notes indicated that Asberger could ambulate without an assistive device, despite his use of his mother's walker, and that an assistive device and/or brace had never been prescribed by any physician.  *Id.*  There was no record of any surgical intervention recommended for the back or neck, and treatment records noted medication non-compliance, Asberger's use of his brother's prescriptions, and a history of drug-seeking behavior.  *Id.*  Although the ALJ did not find enough evidence that his substance abuse was a contributing factor material to his finding, it called into question Asberger's motivation for increasing medication dosages.  *Id.*

### D.    Step Four – Plaintiff's RFC

The fourth step of the disability evaluation requires an ALJ to determine whether a claimant has the RFC to perform his past relevant work ("PRW").  20 C.F.R. §§ 404.1520(f), 416.920(f).  To answer this question, an ALJ must first determine a claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  RFC is a function-by-function assessment of a claimant's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments.  SSR 96-

8p, 61 Fed. Reg. 34474 (July 2, 1996).  In making this finding, an ALJ must consider all the relevant evidence such as symptoms and the extent to which they can be reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996); 96-7p, 61 Fed. Reg. 34483 (July 2, 1996).  To the extent that statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, an ALJ must make a finding on the credibility of a claimant's statements based on a consideration of the entire case record.  An ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 61 Fed. Reg. 34489 (July 2, 1996); 96-5p, 61 Fed. Reg. 34471 (July 2, 1996); and 06-3p, 71 Fed. Reg. 45593 (Aug. 9, 2006).

After considering the entire record, the ALJ concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b).  AR 19.  Specifically, the ALJ found Asberger could lift and carry no more than 10 pounds, frequently, and 20 pounds occasionally.  *Id.*  Asberger could sit for 6 of 8 hours in a work day, and stand and/or walk for 6 of 8 hours in a work day.  *Id.*  No assistive device was medically necessary for ambulation and Asberger could frequently balance, kneel, and climb stairs/ramps, occasionally stoop, crouch and crawl, occasionally climb ladders, ropes and scaffolds.  *Id.*  However, he was limited to occasional overhead reaching with the bilateral upper extremity with no limitations on all other reaching bilaterally.  *Id.*  Asberger should avoid concentrated exposure to workplace hazards, extreme cold, fumes, dust, gases, odors, and poor ventilation.  *Id.*

In making this finding, the ALJ "considered all symptoms, and the extent to which these symptoms may reasonably be accepted as consistent with the objective medical evidence and the other evidence, and other evidence."  *Id*.  He considered Asberger's testimony and the medical record, including the UMC Lied Clinic records submitted after the hearing.  AR 19-25.  He also considered opinion evidence.  AR 25-30.  The ALJ found that Plaintiff's medically determinable impairments could not reasonably be expected to produce all of the alleged symptoms, to the degree alleged.  *Id.*  He found that Asberger's statements concerning the intensity, persistence, and limiting effects of these symptoms were not substantially credible.  *Id.*

Once an ALJ has determined a claimant's RFC as an initial consideration at step four, an ALJ utilizes the RFC assessment to determine whether a claimant can perform his PRW.  20 C.F.R. §§ 404.1520(f), 416.920(f).  PRW means work performed either as a claimant actually performed it or as it is generally performed in the national economy within the last fifteen years or fifteen years prior to the date that disability must be established.  In addition, the work must have lasted long enough for a claimant to learn the job and to perform it as SGA.  20 C.F.R. §§ 404.1560(b), 404.1565, 419.960(b), 416-965.  If a claimant has the RFC to perform his or her past work, then an ALJ makes a finding that a claimant is not disabled.

At step four in the Decision, the ALJ concluded that Asberger was capable of performing his PRW as a casino gambling dealer.  AR 30-31.  The Dictionary of Occupational Titles ("DOT") categorizes the job of a gambling dealer as light skilled work with an SVP of 5.  AR 31.  The ALJ found that an individual with a "light" level of work designation with the RFC he found for Asberger could perform Asberger's PRW as a gaming dealer.  AR 31.  The DOT indicates a gambling dealer requires a "light" level of exertion with occasional feeling and handling; frequent fingering and talking; constant reaching (but not overhead); and occasional stooping.  *Id.*  These job skills did not exceed the physical residual functional capacity findings the ALJ made.  *Id.*  Asberger failed to indicate sitting and standing are requirements in the job, so the ALJ was unable to ascertain whether Asberger could perform the work as actually performed.  *Id.*, citing Asberger's work history report in the Administrative Record.  The ALJ therefore found that in accordance with the DOT, Asberger could perform this job as it is customarily performed.  *Id.*  As a result, the ALJ found that Asberger was not disabled.  Alternatively, the ALJ conducted a step five analysis.

### E.    Step Five

Step five of the disability evaluation requires an ALJ to determine whether a claimant is able to do any other work considering his RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If he can do other work, then an ALJ makes a finding that a claimant is not disabled.

At step five, the ALJ found Asberger was born September 10, 1959, and was 47 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.  AR 32.

1   Asberger's age category was subsequently changed to closely approaching advanced age by the
2   time of the hearing.  *Id.*  The ALJ found that Asberger had a limited, eleventh grade education and
3   was able to communicate in English.  *Id.*  The transferability of job skills was not material to the
4   determination of disability because using the Medical-Vocational Rules as a framework supported
5   a finding that Asberger was "not disabled," whether or not Asberger has transferable job skills,
6   under SSR 82-41 and 24 C.F.R. Part 404, Subpart P, Appendix 2.  Because Asberger had the RFC
7   to perform the full range of light work, considering his age, education and work experience, a
8   finding of "not disabled" would be directed by Medical-Vocational Rule 202.18, and Rule 202.11
9   (at age 50).  *Id.*  The additional limitations the ALJ found had little or no effect on the occupational
10  base of unskilled light work, and a finding of "not disabled" was therefore appropriate under these
11  rules.  *Id.*  SSR 96-9p substantiated this conclusion, because Asberger's limitations failed to
12  diminish the unskilled "light" occupational base to the point of insignificance.  *Id.*  The ALJ
13  therefore found that Asberger had not been under a disability, as defined in the Social Security
14  Act, from January 15, 2007, through the date of his decision.

15  **III.    THE PARTIES' POSITIONS ON APPEAL**

16      **A.    Asberger's Motion for Reversal or Remand**

17      Asberger seeks reversal and remand of the ALJ's decision on the sole ground that the ALJ's
18  RFC determination was not supported by substantial evidence in that he failed to properly evaluate
19  medical evidence in the record.  Asberger claims that the medical evidence only supports an RFC
20  of no more than sedentary.  The ALJ gave significant weight to the opinions of consulting examiner
21  Dr. Cabaluna, and reviewing examiner Dr. Dhaliwal.  Asberger claims that these opinions are not
22  substantial evidence supporting the ALJ's decision because later records produced from the UMC
23  Lied Adult Outpatient Clinic from September 27, 2011, through October 9, 2012, indicate a
24  diagnosis of chronic back pain.  These records, it is argued, establish that Asberger's condition
25  was worsening and called into question Dr. Cabaluna's opinions.

26      Although acknowledging that state agency physicians are highly qualified physicians who
27  are experts in the evaluation of medical issues and disability claims under the Social Security Act,
28  Asberger argues that neither Dr. Dhaliwal, nor any other state agency physician, reviewed records

1   after August 17, 2011.  Thus, the ALJ failed to meet his burden at step five of the sequential

2   evaluation because the jobs identified exceeded Asberger's physical capabilities which were no

3   more than sedentary.  The court should therefore reverse for an award of benefits.  In the

4   alternative, the court should remand the matter for proper evaluation of Asberger's physical

5   impairments.

6              **B.    The Commissioner's Cross Motion to Affirm and Opposition**

7              The Commissioner seeks an order affirming the ALJ's decision arguing the ALJ properly

8   considered the medical evidence of record in determining Asberger's RFC which was supported

9   by substantial evidence.  The opinions of consultative examining physician Dr. Cabaluna, and state

10  agency physician Dr. Dhaliwal were accorded significant weight and constituted substantial

11  evidence in support of the ALJ's RFC finding.  Dr. Cabaluna examined Asberger on June 29, 2011,

12  and opined that Asberger could lift and/or carry 20 pounds occasionally and 10 pounds frequently;

13  stand and/or walk for 6 hours in an 8-hour day, and that an assistive device was not medically

14  necessary for ambulation for short distances or level surfaces.  Dr. Cabaluna also found Asberger

15  could sit for 6 hours or more in an 8-hour day; frequently balance, kneel, and climb ramps and

16  stairs; occasionally stoop, bend, crouch, crawl, and climb ladders and scaffolds; and had a reaching

17  limitation due to shoulder pain and reduced shoulder range of motion.  Dr. Cabaluna's own

18  independent examination of Asberger and findings constituted substantial evidence in support of

19  the ALJ's RFC finding.

20             Similarly, Dr. Dhaliwal reviewed Asberger's records on August 17, 2011, and reached

21  similar conclusions that Asberger could perform a full range of light work.  State agency medical

22  consultants are highly qualified physicians who are experts in the evaluation of medical issues and

23  disability claims.  The two consistent medical opinions of Dr. Cabaluna and Dr. Dhaliwal

24  constitute substantial evidence in support of the ALJ's finding that Asberger could perform a full

25  range of light work.

26             The Commissioner also points out that Asberger has not cited to any medical opinion which

27  supports his contention that he could only perform sedentary work.  His motion is supported by

28  his own opinion and interpretation of the medical evidence based on some objective findings in

the record.  Additionally, the UMC medical records from September 2011, through October 2012, do not show objective findings consistently present throughout this period.  Many of the objective findings in the later records were also present two years prior in 2010.  For example, Dr. Sharma examined Asberger in June 2010, and reported similar findings including tenderness, a positive straight leg raise test, and an antalgic gait.  AR 22, 306-307.  These findings do not indicate that Asberger's condition had deteriorated from what it had been, and in fact, a February 2012 treatment record notes that Asberger's pain had improved from his last visit and he was in no acute distress, citing AR 420.

The ALJ also found that Asberger was not fully credible because of routine treatment, medical non-compliance, inconsistent statements, drug-seeking behavior, daily activities and poor work history.  Notably, Asberger does not contest the ALJ's credibility finding.  Asberger's argument that he could only perform sedentary work is wholly unsupported by the Administrative Record and must therefore fail.

The Commissioner therefore asks the court to grant her cross-motion to affirm.  If the court is inclined to overturn the agency's decision, the Commissioner asks that the matter be remanded to the agency for additional investigation or explanation arguing that Asberger has failed to show he is entitled to remand for an award of benefits.

## IV.    THE ADMINISTRATIVE RECORD

### A.    The Administrative Hearing Testimony

Asberger appeared at the Administrative Hearing represented by Attorney Robert Fleming.  AR 41.  At the time of the hearing, he was 53 years old and single.  AR 43.  He completed the 11th grade, but did not obtain a GED.  *Id.*  He had never been in prison, but was in jail twice, once for thirty days for possession of marijuana, a misdemeanor.  AR 44.  He received food stamps and had a county medical card.  AR 45.  He arrived by bus and had to transfer.  *Id.*  He smoked about a pack of cigarettes a day.  AR 45-46.  He afforded cigarettes with the help of his brother.  AR 46.  He had a valid driver's license, but did not have a vehicle.  *Id.*  He typically went to the grocery store by bus.  *Id.*

When asked how he spent a typical day, Asberger testified that he slept most of the time, sat on the couch and watched television because he could not do much of anything else.  AR 47. He had previously worked at several casinos including the Golden Gate, Westward Ho, the Las Vegas Club, and Union Plaza.  *Id.*  He also worked at Player's Island, which was originally known as the Casablanca.  *Id.*  He dealt mostly craps.  AR 48.

Asberger previously applied for disability benefits and received an unfavorable decision by a San Diego judge in 2009.  *Id.*  The ALJ inquired whether there were some *Chavez* issues involved in this case.  *Id.*[2]  Counsel for Asberger indicated he did not believe there was a *Chavez* issue because "everything seems to be getting worse."  *Id.*  At the time of the first claim, Asberger was not using a walker and did not have other limitations as far as reaching.  *Id.*

The ALJ inquired whether the walker Asberger was using had been prescribed.  Asberger responded that it was not, and that his mother had passed away two years ago, so "I had grabbed that."  *Id.*

In response to questioning from his counsel, Asberger testified that he was in pain all of the time through his entire back, but mostly his lower back.  AR 49.  He did not shower often, only once a week, because he was in pain most of the time.  *Id.*  At the time of the hearing, he was seeing doctors at the UMC Lied Clinic for back pain.  *Id.*  They gave him pain medication, morphine, Lortab, muscle relaxers and blood pressure medicine.  *Id.*  His doctors had not discussed any kind of back surgery with him.  *Id.*  He rated his pain a 7 on a scale of 1-10.  *Id.*  This was the pain level he experienced on medication.  AR 50.  He had been using the walker about 2 years and used it all the time.  *Id.*  Asberger testified that sometimes he needed it and sometimes he did not.  *Id.*  Sometimes he was not in that much pain, but most of the time he was and used the walker.  *Id.* He did not use any braces and none had been prescribed.  *Id.*

Asberger testified that he was always drowsy, tired and sleeping because of side effects from medications.  AR 51.  He took morphine, Lortab, and muscle relaxers twice a day.  *Id.*   After

---

[2] The parties were referring to the Ninth Circuit's decision in *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988), which involves principles of *res judicata* when considering a subsequent claim for disability after a prior claim has been adjudicated.  Neither side claims *Chavez v. Bowen* applies to this appeal in their moving or responsive papers.

taking his medication he would sit on the couch and try to watch television, but most of the time he never saw a full show because he was always sleeping and tired. *Id.* The doctor could prescribe a lower dose of pain medications, but Asberger believed the pain would then be "just unbearable." *Id.*

At one point while working at the Westward Ho, they put him on a 21 game when he could not perform craps anymore because his back kept going out and he wasn't able to stand. AR 51-52. He could not be a blackjack dealer because the same thing happened—halfway through the shift his back would go out because he'd stretched to the right or the left, and then have to leave early. AR 52. He did not believe he could deal a table game just sitting because he was always so tired. *Id.* He could stand 10 minutes at a time without the walker before getting severe pain in his lower back which shoots up his spine into his neck. *Id.* He could sit 20-30 minutes at a time. *Id.* While sitting in a chair, a lot of times he tried "to prop it up" to take the pressure off his back. *Id.* Then his neck would start to bother him, so he laid down. *Id.* "It's a back-and-forth thing."

Asberger testified he could lift maybe 10 pounds or a gallon of milk. AR 53. His brother helped him with food shopping sometimes. *Id.* He shopped for light stuff like eggs and bread, and if there was anything heavy, Asberger's brother would take him to the store. *Id.* Asberger's brother helped with the laundry. *Id.* Asberger did not do any chores around the house. *Id.* He had to sit down to get dressed. *Id.* Asberger testified that he didn't "really sleep," *i.e.*, he woke up through the night five or six times because of pain. AR 54. He was in pain 24 hours a day. *Id.* He was hoping that eventually he could get surgery "so maybe they could fix it." *Id.*

The ALJ indicated he would put the case on hold to allow counsel to submit the additional medical records from UMC Lied, and noted that he did not have any actual treatment records after August 2010. *Id.*

/ / /

/ / /

/ / /

/ / /

/ / /

14

**B.    Treatment Records**

The treatment records in the Administrative Record consist of the following:

<u>UMC Emergency Department/Chest Pain, dated August 17, 2005 – August 18, 2005, from UMC.  AR 244-277.</u>

Asberger was admitted to UMC on August 17, 2005, and discharged the following day. He complained of left-side chest pain while walking the lot as a car sales person.  A series of laboratory and diagnostic tests were performed to rule out cardiac pathology.  Follow up as an outpatient was recommended, but Asberger refused any additional workup and was sent home on aspirin, Plavix, and Zocar.

<u>Radiology Report, dated 11/08/2007, from Nevada Imaging Centers.  AR 278-79.</u>

An MRI of the lumbar spine on November 8, 2007 found no evidence of disc herniation, acute skeletal pathology, and that the study was "unremarkable for age."

<u>Laboratory Test Report, dated 12/31/2008, from LabCorp.  AR 280-283.</u>

A metabolic panel and venipuncture was done which revealed nothing remarkable, except that Asberger had a high potassium level.

<u>Sunrise Hospital Medical Center records dated April 5, 2010.  AR 284-289.</u>

He arrived at Sunrise Hospital Medical Center by private vehicle complaining of back pain and chronic back pain with an onset of six months prior.  He described it as constant and moderate in degree in the area of the lower lumbar spine and right lower lumbar spine radiating to the neck and to the right hand.  Physical exam, laboratory, X-ray, and EKG tests were run.  The impression was mild lumber spondylosis with no acute abnormality.  He was discharged with a disposition note that his condition was good and stable.  The clinical impression was chronic back pain of the lumbar region.  He was given 15 Lortab and instructed to take 1 or 2 orally every 6 hours with no refills, and prescribed 4 Prednisone 10 mg tablets 4 times a day for 5 days, then 2 times a day for 3 days, then 1 every day for 2 days.  No refills.  On physical assessment, he was ambulatory and alert, and appeared in no acute distress.  On discharge, he reported a pain lever of 2 on a scale of 1 to 10.  X-rays of the lumbar spine indicated the bony alignment was maintained, mild disc space narrowing diffusely, and vertebral height maintained with no evidence of fracture.

<u>Steinberg Diagnostic Imaging Centers Radiology Reports, both dated 6/23/2010.</u>
<u>AR 290-305</u>.

A radiology report dated June 23, 2010, reflects an MRI of the cervical spine was conducted which found degenerative changes in the cervical spine, worse at C5-C6, spinal canal stenosis at this level with the AP diameter of the canal measuring 7 mm.  There was moderate to severe bilateral neuroforaminal narrowing.  A second MRI was conducted of the lumbar spine on June 23, 2010.  The impression was minimal degenerative changes in the lower lumbar spine with no spinal canal or neuroforaminal stenosis.

<u>Dr. Sharma clinic notes.  AR 306-311</u>.

Asberger saw Dr. Sharma, of Advanced Pain Management Center on June 9, 2010.  He was referred by Dr. Bhatia for a consultation complaining of low back pain and bilateral leg pain.  On examination, he was noted to be in moderate discomfort with a left antalgic gait; pain dermatomal distribution bilateral at S1.  He was able to stand on his heels and toes, had no muscle atrophy, and walked without a cane or walker.  There was no scoliosis, normal lordotic curve, bilateral paraspinous tenderness to palpation.  Muscular strength was 5/5.  He had a positive bilateral straight leg test, negative Patrick Test, his deep tendon reflexes were intact, but some sensory deficit was noted in the left at L5 and left S1.  On inspection, he was in no apparent discomfort.  There was no muscle atrophy noted, and he had some limited range of motion on all planes.  The assessment was lumbar radicular syndrome (severe and worsening); discogenic syndrome (severe and worsening); lumbar spondylosis (sever and worsening); cervical radicular syndrome (severe and worsening); and cervical spondylosis (severe and worsening).  The plan was to prescribe Lortab and Ibuprofen and have Asberger return to the clinic in two weeks.  Lumbar and cervical MRIs were recommended.  However, he stated that he did not have insurance and could not afford to pay for the MRIs.  He was prescribed 60 Lortab and instructed to take 1 by mouth every 6 hours as needed for pain, and 6 mg tables of Ibuprofen and instructed to take 1 every 8 hours as needed for pain, with 2 refills.

Asberger visited Dr. Sharma for a follow up appointment on July 10, 2010, complaining of low back pain most prominent in the lower lumbar spine, and radiating to the bilateral buttock,

posterior thigh, bilateral calf and bilateral foot.  Dr. Sharma noted that MRIs had been ordered and a mild diffuse disc bulge at L4-5 was noted with mild bilateral facet arthropathy reported at L4-5 and L5-S1 levels.  (The 2 MRS's done at Steinberg Diagnostic on June 23, 2010, were included with Dr. Sharma's medical records.)  Asberger also complained of neck pain radiating to the right shoulder that was a chronic problem with an onset approximately 3 years prior.  On examination, he was in mild discomfort, left antalgic gait was noted with pain dermatomal distribution bilateral at S1.  He was able to stand on his heels and toes with no muscle atrophy, and walked without a cane or walker.  He was positive for thoracic kyphosis with no scoliosis and no lordotic curve.  Range of motion on flexion was limited to 50 degrees and extension to 10 degrees.  On palpation, there was bilateral paraspinous tenderness.  Muscular strength of the upper and lower extremities was 5/5.  The assessment was lumbar radicular syndrome (severe); cervical radicular syndrome (severe); discogenic syndrome (severe); lumbar spondylosis (severe); and cervical spondylosis (severe).  The plan was no change in medication and a interlaminar epidural steroid injection was recommended which Asberger said he could not afford because he did not have health insurance.  He was told to return to the clinic in 1 month.  Asberger indicated he wanted to be treated conservatively with medications only.  AR 311.  His prescription for Lortab was refilled.  He was instructed to take 1 tablet by mouth as needed for pain every 6 months and was given 120 pills with no refills.

Dr. Bhatia clinic notes.  AR 318-330.

Asberger treated with Dr. Bhatia on August 2, 2006, (AR 329-30) complaining of depression, and was diagnosed with anxiety, depressive disorder, and chronic ischemic heart disease by history.  He was prescribed 20 mg Prozac, given a lab slip for LabCorp to get a lipid test to evaluate whether he should be placed on lovastatin and a beta blocker for his heart condition.  He next saw Dr. Bhatia on August 16, 2010, for an evaluation after a motor vehicle accident.  AR 327-28.  He reported that he was fine immediately after the accident, but complained of pain on the right-hand index finger and right shoulder/upper back discomfort, and that his muscles had "spasmed" up with a bit of neck discomfort.  On physical examination, he was in no acute distress, well nourished, and well groomed.  His neck was supple with mild discomfort on palpation to the

right shoulder and the right upper back/shoulder.  The diagnosis was myalgia and myositis, spasm of muscle, and sprain of unspecified site of the shoulder and upper arm.

He saw Dr. Bhatia on November 4, 2008, to fill out a welfare form complaining of a lump or a sore on his upper back, fatigue and no appetite over the past 2 months.  On physical examination, he was in no acute distress, well nourished, and well groomed.  On neurological examination, he was grossly intact with no acute deficits noted.  At the time of the visit, he was prescribed Keflex, Ibuprofen, and Flexenl which were removed.

In an office visit on December 31, 2008, Asberger presented with chest congestion and a sore throat. AR 324-25.

He saw Dr. Bhatia on April 28, 2010, as a follow up from his Sunrise Hospital visit for back pain. AR 321-322.  He reported significant pain of the mid-back radiating down his right leg and occasionally up his right shoulder.  He came in because he was not improving, and reported he did not get relief from Lortab and steroids that were prescribed at Sunrise.  He had run out of his medication.  On physical examination, he was in no acute distress, well nourished, and well groomed.  His neck was supple and chest was clear.  There was moderate discomfort in the low spine noted on palpation, and neurological examination was grossly intact with no acute deficits noticed.  The diagnosis was back ache unspecified, spasm of muscle, and lumbosacral spondylosis without myelopathy.  He was prescribed a Medrol dose pack,  Contin 15 mg every 12 hours as needed for pain, and told if there was any suspicion of dependency the prescription would be stopped.

Clinic notes of an office visit on May 18, 2010, indicate Asberger reported complaining of pain in his arms and legs.  He complained of too much sweating with his pain medication and steroid pack and noted he had a better response with Lortab/Percocet and requested a refill on one of those.  On physical examination, he was in no acute distress, well nourished, and well groomed. His neck was supple and chest was clear.  Neurological exam was grossly intact with no acute deficits noted.  The assessment was unspecified drug or medicinal substance causing adverse effects in therapeutic use, and other chronic pain.  He was prescribed Percocet and told not to get

prescriptions from other providers, and that Dr. Bhatia did not prescribe Percocet on a long-term basis.  AR 319-320.

In an office visit on August 18, 2010 (AR 318-19) he saw Dr. Bhatia for a disability letter. On physical examination, he was in no acute distress, well nourished, and well groomed.  His neck was supple and his chest was clear.  On neurological examination, he was grossly intact with no acute deficits noted.

Dr. Thomas clinic notes.  AR 331-333.

In clinic notes of an August 31, 2010 visit with Dr. Mary Thomas, Asberger reported with complaints of back pain and neck pain which he indicated he had had for approximately 30 years. He had not been working for the past 2 to 3 years and was interested in applying for disability.  He described pain in his neck and back as aching and constant, intermittently more intense at other times with occasional leg symptoms, but denied numbness and tingling stating he was hurting at all times.  He had not been receiving any therapy recently at the time of this visit.  He reported his current medications were Ibuprofen and Lortab which he found helpful.  He also reported depression, anxiety, soreness, rash, weakness, weight loss, heartburn and leg pain with walking. On physical examination, his neck and back revealed mild paraspinal muscle tightness in the cervical and upper thoracic region and lumbar region.  He had normal cervical range of motion, but was slow in changing position.  His functional range of motion was normal, although he reported pain and was slow in the transitions.  On neurological examination, he had some slight weakness of the left greater than the right hip flexors, his distal strength was intact and sensation intact, reflexes symmetric, and normal strength in the upper extremities.  He brought in an MRI report indicating no evidence of disc herniation, and skeletal pathology which was unremarkable for age.  The report of this visit indicates the records Dr. Thomas reviewed were from Dr. Sharma and the MRIs at Steinberg.  Dr. Thomas' impression was a history of cervical and lumbar spondylosis with stenosis at C4-5.  She recommended that "the patient be in off-duty status with regard to work from August 31, 2010, until his follow up next month.  He was prescribed Lortab and a home exercise program.  Asberger inquired regarding his application for disability and was told to initiate this through the social security office.

1       <u>UMC Lied Clinic Records.  AR 401-434</u>.

2       Asberger was seen at the UMC Lied Clinic on various occasions between September 27,

3   2011, to October 9, 2012.  On his first visit, he presented to establish a primary care provider.  AR

4   402-405.  His vital signs were normal.  He reported pain of 7 to 10 on his spine.  He indicated he

5   took marijuana regularly and was taking Lortab.  His chief complaint was neck and right shoulder

6   and spine pain.  He was assessed with back pain, depression, ulcers, tobacco and poly substance

7   use.  The plan was to prescribe Robaxm, Pepcid, and obtain an X-ray of the spine.  He was also

8   prescribed Tramadol and told never to use another person's prescription medication.  At this visit,

9   he reported pain in the upper and mid-back area with a history of headaches about once a week for

10  which he usually took Tylenol or aspirin.  On examination, he presented with no acute distress.

11  The plan notes indicate that Asberger was told he was coming to "a crossroads where he needs to

12  decide if he wants to use narcotic medication and western medicine, or if he is going to use street

13  medication including marijuana, and will have to make that decision."

14      He was next seen at UMC on November 1, 2011.  AR 406-409.  X-rays had been done

15  since his last visit.  The lumbosacral spine showed mild degenerative change and loss of disc height

16  at L5-S1.  MRI of thoracic spine showed vertebral body height loss in the upper thoracic vertebral

17  bodies, and the cervical spine showed a multi-level retrolisthesis of C2 on C3, C3 on C4, and C5

18  on C6 which was noted as possibly degenerative.  His back pain was chronic, not new or acute.

19  He had not filled the medications that were given to him on September 27, 2011, but planned to

20  pick them up that morning.  The assessment was chronic back pain with degenerative changes on

21  X-rays from October 20, 2011, a history of depression, a history of ulcer, tobacco dependence, and

22  poly substance use including marijuana.  He was referred for physical therapy and a pain specialist,

23  and was advised to take his medications as prescribed.  There is a note that he was previously

24  taking his brother's Lortab and was advised not to take anyone else's pain medications, and was

25  told to return for follow up in 1 to 2 months.

26      Asberger was seen at the clinic on December 20, 2011, complaining of back pain which he

27  rated 7 on a scale of 1 to 10.  He was referred to a pain specialist for an appointment in April 2012,

28  and prescribed Morphine, Lortab for breakthrough pain, Pepcid for his history of ulcer, and told

to return to the clinic in a month to reevaluate how his medication were working.  He was also advised to do a chest X-ray.

In a visit on January 23, 2012, he complained of low back pain which he rated 8 on a scale of 1 to 10, indicating he tripped and fell over his dog 2 days prior and fell on his tailbone.  AR 414-417.  His chief complaint at that time was back pain.  In the section on the history of his present illness, Asberger reported that the pharmacy shorted him 10 of his Morphine pills and 5 of his Lortab.  He asked if he could have more Lortab.  On physical examination, he presented in no acute distress, although he was walking with a walker.  A chest X-ray was taken on January 18, 2012, which was in normal limits.  The plan was to increase his dose of Morphine for low back pain, and he was prescribed Robaxin twice daily for neck pain and Norco up to 3 times a day as needed for breakthrough pain.  He was given 60 tablets of Norco with no refills and advised to keep his pain clinic appointment in April 2012, and to return to the clinic in a month to assess the effectiveness of his medication.

On February 22, 2012, he reported to UMC complaining of low back pain and requesting a refill of his pain medications.  AR 418-421.  He stated he was hoping to get something "a little bit stronger for the breakthrough pain as he feels incapacitated after doing any kind of activity."  On examination, he presented in no acute distress and was using a walker indicating he would be getting a scooter soon.  The assessment was chronic low back pain with a history of degenerative disc disease and ulcer.  The plan was to continue with present medication, increase Norco to 10/325 twice daily as needed, and he was advised to keep his pain clinic appointment and return for a prescription refill in 1 month.

His next visit to UMC Lied was on July 17, 2012.  AR 422-425.  He was there to establish primary care and had kept his appointment with a pain management clinic.  On physical examination, he complained of erectile dysfunction, his neck was supple, his chest was clear, his heart had a regular rate and rhythm without murmur, his extremities were within normal limits, and his neurological examination was intact without deficit.  The assessment was degenerative disc disease of the cervical and lumbar spine, fatigue, and erectile dysfunction.  The plan was to get laboratory work to evaluate his fatigue, rule out Diabetes, HIV, an acute Hepatitis panel, and

testosterone level.  His current medications were Morphine sulfate, Norco and Robaxim.  A DEXA scan was recommended due to thoracic vertebral fractures in the past.  The diagnosis was degenerative disc disease of the cervical, thoracic and lumbar spine with a history of thoracic vertebral fractures, anxiety, depression and fatigue.  He was told to follow up in 3 months for a blood pressure check.

On October 9, 2012, he went to the clinic for follow up.  AR 426-430.  He had not done any of the lab work or DEXA scan that was ordered at the prior visit.  He had been seen by Dr. Ezeanolue for pain management.  At the time of the visit, he was complaining of cervical neck pain, thoracic neck pain, and lumbosacral back pain with pain radiating down his arms and legs. He stated he was unable to stand for more than 10 to 20 minutes without severe pain in his legs and back.  X-rays of the low back and thoracic spine and cervical spine were in the UMC records from October 20, 2011.  The cervical spine showed multi-level retrolisthesis of C2 on C3, C3 on C4, and C5 on C6, possibly degenerative, with no displaced vertebrae.  There was no tenderness. The thoracic spine showed mild vertebral body height loss in the upper thoracic spine.  The lumbar spine MRI showed no fracture or mal-alignment, but mild degenerative changes.  On physical examination, the neck was supple, the extremities were within normal limits, some back spasm in the thoracic and lumbosacral regions was noted with a positive straight leg test bilaterally. Neurologic exam was grossly intact without deficit although Asberger had an antalgic gait.  The assessment was cervical, thoracic, and lumbar arthritis, and radiculopathy, degenerative disc disease of the cervical, thoracic, and lumbosacral spine, fatigue, a history of erectile dysfunction, anxiety, depression, and opiate dependent pain.  The plan was to obtain a CT scan of the cervical, thoracic, and lumbosacral spine, start medication for hypertension, get a chest X-ray and EKG, and lab work requested from the previous visit.  A follow up was suggested in 3 months.

### C.    Consulting Examiner's Report - Dr. Cabaluna.  AR 360-369.

Asberger was seen by Dr. Cabaluna for a consultative examination on June 29, 2011.  AR 360.  His medical records were reviewed by Dr. Cabaluna.  He had no complaints at the time of the examination.  *Id.*  Dr. Cabaluna noted a history of neck and bilateral shoulder pain and low back pain for over 30 years.  *Id.*  Asberger reported the pain had gotten worse within the past 5

years. *Id.* An MRI of the cervical spine on June 23, 2010, showed multi-level degenerative disc changes, worse at C5-C6, with spinal stenosis and moderate to severe bilateral foraminal narrowing. *Id.* Asberger reported motor vehicle accidents. *Id.* He broke his right collar bone riding a moped in 2007 and was treated with a sling. *Id.* He injured his left shoulder in a motorcycle accident in 1991, which was treated with a sling. *Id.* He had a jeep accident in 2005. *Id.* He was seen by a chiropractor 5 years ago. *Id.* He had X-rays a year prior, and his last visit was in 2010. *Id.* On physical examination, he reported occasional headaches with no blurred vision, dizziness, or hearing impairment. AR 361. He was taking Advil as needed. *Id.* He was also taking Lortab occasionally from his brother. AR 362. He had less-than-normal weight for his height, was properly dressed, coherent, oriented to time, place, person, and purpose of visit, alert, comfortable, and cooperative. *Id.*

His speech and hearing were normal. *Id.* He had decreased ranges of motion of his neck which was supple. *Id.* Hand grasp was 5/5 and strong. *Id.* He had diminished ranges of motion of his shoulders, but could pick up a coin from a flat surface and place it in a container with each hand with no difficulty, tie a knot with no difficulty, button and unbutton his shirt with no difficulty, and open a tightly-closed lid with each hand with no difficulty. AR 363. There was no evidence of scoliosis or paravertebral muscle tenderness or spasm. *Id.* Straight leg test was negative on both legs, supine and seated. *Id.* There was no evidence of sciatica. *Id.* There was no evidence of atrophy or fasciculations on musculoskeletal examination. *Id.* He had a normal gait and normal weight bearing, but humped forward pushing a wheeled walker. *Id.* There was no evidence of foot dropping or shuffling. *Id.* He was slow getting off and on the examining table, had difficulty with tandem walking, and declined to walk toes on heels. He could squat halfway and did not need an assistive device for short distances on a level surface. AR 364. The rest of the physical examination was unremarkable.

Dr. Cabaluna's diagnostic impression was a history of neck and bilateral shoulder pains from multi-level degenerative disc disease, worse at C5-6, with spinal stenosis and bilateral foraminal narrowing and low back pain. His behavior during the examination was appropriate.

He related well and understood and followed instructions. *Id.* His memory and ability to concentrate were intact.

Dr. Cabaluna made findings indicating Asberger was capable of performing work at the light exertional level, notwithstanding his noted impairments. Asberger could occasionally lift 20 pounds, frequently lift 10 pounds, and stand or walk 6 hours in an 8-hour work day. AR 367. A cane, crutch, or assistive device was not medically necessary for ambulation for a short distance on a level surface. *Id.* He was able to sit cumulatively 6 or more hours in an 8-hour work day. *Id.* He was able to frequently climb ramps and stairs, and occasionally ladders and scaffolds. *Id.* He could frequently balance, stoop, bend and kneel, and occasionally crouch/squat and crawl. *Id.* Standard work breaks and lunch breaks would provide sufficient relief to allow him to work for 8 hours. AR 368. He had limitations in reaching based on pain on is bilateral shoulders. *Id.* He had no limitations in fingering, handling objects, hearing, seeing, speaking or traveling. *Id.* There were no restrictions on heights, moving machinery, temperature extremes, chemicals, dust, noise, or vibration. *Id.*

**D.      Reviewing Examiner's Report - Dr. Dhaliwal. AR 390-397.[3]**

Dr. Dhaliwal also concluded that Asberger was able to perform work at the light exertional level in spite of his conditions. Dr. Dhaliwal performed a physical residual functional capacity assessment on August 17, 2011. He concluded that Asberger could occasionally lift 20 pounds frequently, lift 10 pounds, and could stand or walk with normal breaks 6 hours in an 8-hour work day. AR 391. Asberger could sit with normal breaks for a total of 6 hours in an 8-hour work day, and his ability to push or pull was unlimited. *Id.* A walker was not needed for short distance and level surface and a cane had not been prescribed. *Id.* Dr. Dhaliwal found that Asberger could frequently climb ramps and stairs, and occasionally climb ladders ropes and scaffolds. AR 392. He could frequently balance and kneel. *Id.* He could occasionally stoop, crouch and crawl. *Id.* The posture of limitations noted were due to his neck, shoulder and back pain. *Id.* Reaching was

---

[3] In addition, a psychiatric review technique was performed by Dr. Richman. AR 339-352; a consultative examination report/mental status report from Dr. Devera. AR 253-259, dated 7/17/2011; and a psychiatric review technique report from Dr. Richman, dated 7/11/2011. AR 376-389. However, Asberger does not claim on appeal that he suffers from any mental impairments that prevents him from working.

limited, but handling, fingering and feeling was unlimited.  *Id.*  No visual limitations were noted.

*Id.*  There are no environmental limitations except he should avoid extreme cold, fumes, odors,

dust, gasses, poor ventilation, and hazardous machinery.  AR 394.  These limitations were due to

his back, shoulder and neck pain.  *Id.*  With respect to the severity of the Asberger's reported

symptoms, Dr. Dhaliwal found they were consistent with his objective diagnosis, but Asberger's

claimed limitations from these impairments were "out of proportion with the objective findings."

AR 395.

Dr. Dhaliwal noted that this was a reconsideration after denial of a prior disability claim.

AR 397.  There were no updated records to review on appeal.  *Id.*  A June 10th MRI of the cervical

spine showed degenerative changes, moderate to severe bilateral foraminal narrowing.  *Id.*

Asberger had a normal gait and normal weight bearing, but humped forward pushing a wheeled

walker, with no evidence of foot drop.  *Id.*  The walker was not prescribed, and the consultative

examiner noted that Asberger did not need it for short distances or level surfaces.  *Id.*  Asberger

did have limited range of motion of both shoulders, neck, and back.  *Id.*  Asberger claimed his

condition had worsened since his last application for disability benefits; however, Dr. Dhaliwal

concluded there was no additional medical evidence of record to support any worsening, and

therefore affirmed the previous residual functional capacity evaluation reached in his case.  *Id.*

## ANALYSIS AND FINDINGS

Reviewing the record as a whole, weighing both the evidence that supports and the

evidence that detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported

by substantial evidence, and the ALJ did not commit legal error.

The sole issue Asberger raises on appeal is the argument that the UMC Lied records

provided after the administrative hearing at most support a finding that Asberger is physically

capable of performing no more than sedentary work.  Asberger does not cite any record or finding

of a treating physician or other health care provide supporting this argument.  The ALJ

comprehensively and exhaustively reviewed the medical evidence of record in this case in reaching

his conclusions.  He systematically cited the medical record in its entirety in chronological order

beginning with Asberger's UMC admission in August 17, 2005, for complaints of chest pain.  The

ALJ correctly found that Asberger had infrequently treated with Primary Care Provider, Dr. Bhatia, for medication management of his medical conditions. The ALJ noted that he began treating with Dr. Bhatia in August 2006, and was evaluated for ischemic heart disease based on Asberger's reports of coronary artery disease. Dr. Bhatia wanted to see him for evaluation of use of a beta blocker and Lovastatin after seeing lab results. However, Asberger did not return until about a year later after a motor vehicle accident.

The ALJ correctly noted that an MRI of the lower spine on November 8, 2007, showed no evidence of disc herniation or acute pathology, and was unremarkable for an individual of Asberger's age. The ALJ correctly noted another long gap in treatment with Dr. Bhatia as Asberger's next visit with Dr. Bhatia was in November 2008, to have a welfare form filled out. The ALJ correctly summarized the Sunrise Hospital records for his visit on April 5, 2010, complaining of lumbar back pain and right lumbar pain radiating to his neck and right hand for the six months prior. The ALJ correctly noted that Asberger's condition did not warrant an admission, and that he was discharged with 15 Lortab pills to take 1 or 2 every 6 hours with no refills, and Prednisone was prescribed. The ALJ pointed out that he saw Dr. Bhatia on April 28, 2010, following his visit to Sunrise Hospital reporting that the Lortab and steroid did not help his backache. However, he was in only moderate discomfort on palpation to the lower spine. The ALJ correctly found that Asberger only saw Dr. Bhatia once more after she prescribed Percocet and told him that she would not prescribe it long term. AR 22.

The ALJ reviewed and discussed the records of Dr. Sharma, the pain management physician to whom Asberger was referred between June and August 2010. He also exhaustively reviewed the UMC Lied Clinic records from September 2011, through October 2012.

In reaching his conclusion that Asberger was capable of performing work at the light exertional level, the ALJ relied heavily on the evaluation conducted by Dr. Cabaluna. He correctly noted that as a consultative examiner, Dr. Cabaluna's opinions were accorded the weight of a non-treating expert medical opinion under 20 U.S.C. C.F.R. § 404.1527(d)(1-2) and 416.927(d)(1-2). He afforded significant weight to Dr. Cabaluna's opinions based on the doctor's physical examination, in conjunction with examinations documented in the objective record. The ALJ

1    accounted for the decreased neck range of motion Dr. Cabaluna noted by reducing his

2    lifting/carrying to only a light amount.  AR 25.  The ALJ accounted for the shoulder impairment

3    and reduced range of motion noted by Dr. Cabaluna by limiting Asberger to only occasional

4    overhead reaching.  AR 26.  The opinion thoroughly reviewed all of the examination findings

5    including Dr. Cabaluna's conclusion that there was no medical necessity for an assistive device.

6    *Id.*  The ALJ found that Dr. Cabaluna's notation that Asberger followed directions well suggested

7    minimal interference in concentration and attention.  *Id.*  Additionally, as Asberger's behavior with

8    Dr. Cabaluna was entirely appropriate, the ALJ found this was indicative of a solid level of social

9    functioning.  *Id.*  The ALJ found that Asberger's alleged symptoms and functional limitations were

10   disproportionate to the objective findings of the medical record and inconsistent with the medical

11   opinion evidence which suggested that he exaggerated his symptoms and limitations and was not

12   fully credible.  *Id.*  Asberger does not challenge any of the ALJ's credibility findings in the

13   decision.

14          The ALJ found that the medical evidence of records revealed that Asberger's back, neck,

15   and shoulder pain was adequately managed with infrequent medication management.  *Id.*  This

16   finding is fully supported by the record.  The ALJ also noted that back and orthopedic impairments

17   are typically expected to improve over time, and that this conclusion was substantiated by the fact

18   that Asberger had not sought any significant invasive treatment.  *Id.*  Rather, the only treatment in

19   the record was chiropractic treatment and physical therapy.  *Id.*  The ALJ correctly noted that Dr.

20   Sharma recommended injection treatment which Asberger said he could not afford.  However, the

21   ALJ found that that treatment was conservative treatment as well.  *Id.*  Additionally, the ALJ's

22   finding that Asberger told Dr. Sharma during a July 10, 2010 visit that he only wanted conservative

23   management in the form of medication is supported by the record.

24          The ALJ also based his opinion that Asberger was able to perform light work on Asberger's

25   reported activities of daily living.  AR 27.  He found Asberger's actual activities were

26   "incongruous with any contention that he could not work."  *Id.*  Asberger testified at the hearing

27   that he would lie down or sit on the couch the majority of the day, shopped for light items, and

28   received help from his brother with the laundry.  *Id.*  However, the ALJ correctly noted that

27

Asberger earlier reported to Dr. Devera in June 2011, that he watched television, did dishes, watered the yard, prepared small meals, and did his own laundry. *Id.* Dr. Devera's records support these findings.[4] The ALJ correctly pointed out that Asberger reported to Dr. Devera that he was unable to sustain employment for physical, as opposed to mental reasons. AR 29.

The ALJ also relied on Dr. Dhaliwal, the reviewing examiner's report, who concluded that Asberger was able to perform at the light exertional level. *Id.* The ALJ's findings that Asberger's past employment as a casino dealer is classified as light skilled work with an SVP of 5 under the DOT.

In sum, it is clear that Asberger has a long history of neck and back pain. However, none of his treating physicians have ever opined that he is incapable of working. At most, there is a recommendation made by Dr. Thomas in 2010, that Asberger should be on "off-duty status from August 31, 2010, through his follow up the next month." The ALJ correctly found that a recommendation for being off duty for 1 month does not satisfy the requirement that Asberger prove he suffers from a disability expected to last 12 months or longer which renders him incapable of working. There is ample support in the Administrative Record for the ALJ's findings that although Asberger suffered from a number of impairments, those impairments could not reasonably be expected to produce the severity of the symptoms, or the limitations Asberger claimed which rendered him incapable of working for a continuous 12-month period.

The court finds that the ALJ properly evaluated the medical evidence of record in assessing Asberger's RFC. Asberger's brief does not assert that the ALJ failed to consider any particular medical evidence in the Decision. Asberger does not challenge the weight the ALJ afforded to the opinions of any of his physicians, consultative examiners, or the state agency review physician and psychologist. He also does not challenge the ALJ's credibility findings or determination that a person of Asberger's age, education, work history, and RFC would be able to do jobs that exist in significant numbers in the national economy, other than to argue unspecified UMC Lied medical records only support a finding he had the ability to perform sedentary work.

---

[4] The court did not summarize Dr. Devera's records because she was the consultative examiner who performed a residual mental status report June 17, 2011, and Asberger does not claim in this appeal that he is unable to work based on any mental impairment. AR 353-359.

1

**CONCLUSION**

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole. It is the ALJ's responsibility to make findings of fact, draw reasonable inferences from the record as a whole, and resolve conflicts in the evidence and differences of opinion. Having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the Court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

Accordingly,

**IT IS RECOMMENDED:**

1. Plaintiff's Motion to Reverse/Remand (ECF No.17) be **DENIED**.

2. The Commissioner's Cross-Motion to Affirm (ECF No. 22) be **GRANTED**.

3. The Clerk of Court be instructed to enter judgment accordingly and close this case.

Dated this 30th day of November, 2016.


_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE